**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
          jwilner@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LISA TSERING, individually and on behalf of all others similarly situated,<br><br>                              Plaintiff,<br><br>        v.<br><br>BYTEDANCE, INC., TIKTOK, INC., and TIKTOK USDS JOINT VENTURE LLC,<br><br>                              Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

# TABLE OF CONTENTS

**PAGE**

NATURE OF THE ACTION ..................................................................................................1

THE PARTIES .......................................................................................................................1

JURISDICTION AND VENUE ..............................................................................................2

FACTUAL ALLEGATIONS ..................................................................................................2

I.      TIKTOK .....................................................................................................................2

II.     TIKTOK'S ONLINE TRACKING TECHNOLOGY ..................................................5

        1.      IP Addresses ....................................................................................................7

        2.      Mobile Advertising Identifiers .........................................................................11

        3.      Email Addresses and Phone Numbers ...............................................................17

    B.      Interception of Communications .................................................................................18

        1.      Universal Resource Locators.............................................................................18

        2.      Button Clicks ...................................................................................................19

        3.      Add to Cart Events ..........................................................................................20

III.    TIKTOK'S ADVERTISING PRODUCTS...................................................................21

    B.      Identity Resolution .....................................................................................................23

    C.      Information Shared Outside of TikTok's Ad Network ...........................................25

IV.     DEFENDANTS' TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES AND ACROSS THE INTERNET ................................................................26

    A.      Zillow .........................................................................................................................26

    B.      Western Union.............................................................................................................28

V.      PLAINTIFF'S EXPERIENCE ...................................................................................30

CLASS ALLEGATIONS.......................................................................................................32

CAUSES OF ACTION...........................................................................................................34

        COUNT I.......................................................................................................................34

        COUNT II......................................................................................................................35

        COUNT III ....................................................................................................................38

COUNT IV ...........................................................................................................40

COUNT V ............................................................................................................42

COUNT VI ...........................................................................................................44

PRAYER FOR RELIEF ..............................................................................................46

JURY TRIAL DEMANDED ........................................................................................47

Plaintiff Lisa Tsering ("Plaintiff") brings this action on behalf of themselves and all others similarly situated against Bytedance, Inc., TikTok, Inc., and TikTok USDS Joint Venture LLC ("TikTok" or "Defendants"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegation specifically pertaining to herself, which are based on personal belief.

## NATURE OF THE ACTION

1. This class action lawsuit sets forth how TikTok surveils of millions of Americans, including millions of people who do not have TikTok accounts, through their activity on the Internet and mobile applications. TikTok, through its software products, tracks in real time and records indefinitely non-anonymous personal information and specific web activity of hundreds of millions of Americans.

2. TikTok collects this information to identify users of the TikTok social media platform and serve them with advertisements based on their activity off the platform and, in doing so, connects intimate details about their person and behavior to an individual's email address and phone number. This, on its own, is invasive enough, but TikTok also collects and stores the information of millions of people who do not have TikTok accounts.

3. This unlawfully collected information is worth billions of dollars to Defendants because it fuels the advertising machine on TikTok, at the expense of Americans' privacy.

4. Plaintiff brings this action to enforce her constitutional rights to privacy and to seek damages under Federal and California law for the harm caused by the collection and sale of their confidential data and personal information.

## THE PARTIES

5. Plaintiff Lisa Tsering is a natural person and citizen of California, residing in El Cerrito, California. While in California, Plaintiff Tsering visited numerous websites where TikTok's tracking technology was present and had her activity on those websites and subsequent activity on other websites tracked by Defendants. Plaintiff Tsering does not have a TikTok account.

6. Defendant ByteDance, Inc., is a Delaware corporation with its principal place of business at 1199 Coleman Avenue, San Jose, CA 95110. ByteDance, Inc., together with the other

defendants and a series of Chinese parent entities, owns and operates the TikTok Pixel and the TikTok social media platform, including its advertising service.

7.    Defendant TikTok, Inc. is a Delaware corporation with its principal place of business at 5800 Bristol Parkway, Suite 100, Culver City, CA  90230.  TikTok, Inc., together with the other defendants and a series of Chinese parent entities, owns and operates the TikTok Pixel and the TikTok social media platform, including its advertising service.

8.    Defendant TikTok USDS Joint Venture LLC is a limited liability company with its principal place of business at 5800 Bristol Parkway, Suite 100, Culver City, CA  90230. TikTok USDS Joint Venture LLC was formed in January 2026 to address concerns about US user data being shared with China. TikTok USDS Joint Venture LLC, together with the other defendants, owns and operates the TikTok Pixel and TikTok social media platform, including its advertising service.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000, exclusive of interest and costs, and at least one member of the proposed class is a citizen of a state different from at least one Defendant.

10.    This has personal jurisdiction over Defendants because Defendants collected the private information of thousands or millions of people in California, sold that information to advertisers in California—who targeted advertisements to Californians based in part on their location in California—and profited from the sale of Californians' personal information. Further, Defendants' principal places of business are in California.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District, Plaintiff Tsering resides in this District, and Defendant ByteDance, Inc. resides in this District.

## FACTUAL ALLEGATIONS

### I.    TIKTOK

12.    TikTok was founded in 2017 after the online content platform ByteDance purchased

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    2

Musical.ly, a lip-sync video sharing platform, in a deal valued at up to $1 billion.[1]

13.    Currently, TikTok is one of the largest social media platforms in the world, with over 1.5 billion users worldwide, and over 130 million users in the United States. It is available through a desktop browser, but also as a mobile application ("the App").

14.    TikTok is "designed for creating, editing, and sharing short videos between 15 seconds and three minutes in length. TikTok provides songs and sounds as well as filters and special effects that users can add to their videos."[2]

15.    The central feature of the TikTok platform is its "recommendation system." This recommendation system is a complex series of algorithms that powers the "For You Page" (FYP), a homepage that "surfaces content tailored to each person's interests. It's designed to keep users engaged by showing them videos they're most likely to enjoy based on a wide range of signals and user interactions."[3]

16.    TikTok's algorithm pushes content to users' FYP in part by analyzing likes, comments, hashtags, video captions and how much time a user spends watching each video. After collating these data points, TikTok can steer users towards more videos that are meant to keep users scrolling.[4]

17.    Users engage with the TikTok social media platform by scrolling through pre-curated videos on their FYP. The videos start automatically upon launching the platform. This "autoplay" feature is designed to immediately engage and keep users' attention.

18.    The autoplay feature is complemented by an "endless scroll," meaning that users never cease being fed content. Users move from video to video seamlessly, simply by making a swiping gesture to move to the next piece of content.

---

[1] *China's Bytedance buying lip-sync app Musical.ly for up to $1 bln*, REUTERS (Nov. 10, 2017) https://www.reuters.com/article/lifestyle/chinas-bytedance-buying-lip-sync-app-musically-for-up-to-1-bln-idUSKBN1DA0BQ/
[2] *TikTok*, BRITANNICA, https://www.britannica.com/topic/TikTok (last accessed Jan. 19, 2026).
[3] *TikTok Algorithm Guide 2026: Everything We Know About How Videos Are Ranked*, BUFFER (Dec. 17, 2025) https://buffer.com/resources/tiktok-algorithm/
[4] *How TikTok Reads Your Mind*, NEW YORK TIMES (Dec. 12, 2021) https://www.nytimes.com/2021/12/05/business/media/tiktok-algorithm.html

19.     Users' interactions with their FYP (the pre-curated content selected by TikTok) are monitored in part to strengthen TikTok's algorithms and continue serving relevant and engaging content. But TikTok also, upon information and belief, monitors users' behavior to better monetize their users' data.

20.     Like nearly all social media platforms, access to TikTok is free. This is because it makes its money elsewhere: through advertising and monetization. In 2024, TikTok made $23 billion, with approximately 80% of that coming from advertising.[5]

21.     TikTok's aggressive push for advertising and monetization in the United States has paid off. "The US accounts for just 10% of TikTok users but generates 41% of the platform's ad revenue worldwide," and "83% of weekly US TikTok users ages 13 and older have taken action after seeing an ad on the platform, including making a purchase (43%)."[6]

22.     TikTok admits that it monitors and collects user information to better advertise and monetize users' attention and interests. TikTok claims that their "Platform uses first-party and third-party cookies for advertising purposes. This includes personalising ads (depending on your settings) based on your browsing habits and profile and your off-app activity. We also use cookies to measure our ads' performance on the Platform." This allows TikTok "[t]o show you personalised ads from an advertiser if you have visited their website or app before."[7]

23.     TikTok also "measure[s] the performance of ads on our Platform. This includes tracking user actions in response to ads. For example, this includes visits to an advertiser's website or purchases. For example, the third-party advertising identifiers 'IDFA' and 'GAID' are used for ad measurement and personalising ads."

24.     The impact of TikTok's surveillance of user behavior is evident all over its platform. Firstly, each user's individual FYP—which contains organic video content—also

---

[5] *TikTok App Report 2025*, BUSINESS OF APPS (Nov. 18, 2025) https://www.businessofapps.com/data/tiktok-app-report/

[6] *US TikTok users are worth 4x more to advertisers than the global average,* EMARKETER (Dec. 8, 2025) https://www.emarketer.com/content/us-tiktok-users-worth-4x-more-advertisers-than-global-average

[7] *TikTok Cookies Policy,* TIKTOK (last updatecd Nov. 4, 2024) https://www.tiktok.com/legal/page/global/tiktok-website-cookies-policy/en

---

contains numerous personalized advertisements for products. The ads are seamlessly integrated with other video content, meaning that users are served ads as part of their "endless scroll."

25.    Users are also served curated products and ads through the TikTok Shop, an online shopping service or marketplace located in the App. The TikTok Shop, which was launched in 2023, was projected to reach "$15 billion worth of sales in the U.S. in 2025," and has nearly caught up with the online retail giant eBay.[8]

26.    This hyper targeted ad delivery is accomplished through TikTok's TikTok For Business Suite of products and the collection of mass amounts of information about users on and off of TikTok.

## II.    TIKTOK'S ONLINE TRACKING TECHNOLOGY

27.    The TikTok Pixel is "a piece of code added to [a TikTok for Business client's] website to reliably and seamlessly share event and optimization data."[9]

28.    In other words, the TikTok pixel is a piece of code that TikTok for Business clients implement on their website to track their users' website behavior. The TikTok Pixel then transmits that user behavior data back to TikTok in order to better target users for advertising.

29.    The TikTok Pixel Tracks a wide variety of user activity across the internet. One report estimates that the TikTok Pixel tracked 2% of all web activity, billions of interactions with websites and apps, in August 2024 alone.[10]

30.    TikTok's Events API (application programming interface) is a "server-to-server (S2S) integration that allows [a TikTok for Business client] to connect web, app, and offline visitor events. Through server-side integration with TikTok, it provides a more reliable connection to your website, app, server, or CRM. It also allows more granular customization of what you share."[11]

---

[8] *How TikTok came to rival eBay as a global online shopping destination*, THE WASHINGTON POST (Nov. 16, 2025), https://www.washingtonpost.com/business/2025/11/16/tiktok-shop-growth-ebay/
[9] *How to unlock performance with data connections*, TIKTOK (last updated May 8, 2024) https://ads.tiktok.com/business/en/blog/data-connections-performance-marketing?tt4b_lang_redirect=1
[10] https://www.ghostery.com/whotracksme/trackers/tiktok_analytics.
[11] *Id.*

31.    The Events API, in other words, further allows TikTok for Business clients to integrate and share their data with TikTok to boost their advertising capabilities.

32.    For TikTok for Business clients, the benefits of utilizing TikTok's Events API include "[i]mproved ad delivery and targeting by capturing missing conversions," and the ability to "[s]end events from various channels, such as websites, mobile apps, physical stores (offline), and CRMs integrations in one API."[12] The Events API gives advertisers "[g]ranular control over the data your business shares with TikTok."[13]

33.    The TikTok Pixel and TikTok's Events API are marketing/advertising solutions that allow TikTok to identify, survey, and categorize users by combining TikTok for Business clients' data with TikTok's own data. In this way, TikTok augments its own data set, and adds to or creates profiles of users for the sake of advertising.

34.    All of this is accomplished through the collection of persistent identifiers and interception of communications by the TikTok Pixel.

### A. Persistent Identifiers

35.    One way that TikTok tracks individuals across multiple websites is through the use of persistent identifiers.  As the name suggests, persistent identifiers are identifying information that follows an Internet user from one website or app to another. Tik Tok uses these identifiers to confirm that a visitor using a particular website is the same person identified by TikTok on its App.

36.    One form of persistent identifier is a browser "cookie."  "Cookies are bits of data that are sent to and from your browser to identify you.  When you open a website, your browser sends a piece of data to the web server hosting that website."[14]

37.    TikTok uses several cookies, including but not limited to "_ttp," "ttcsid_," "ttclid" and "_pangle."[15]  TikTok says that these cookies can "help match events with people who engage

---

[12] About Events API, TIKTOK (last updated Apr. 2025) https://ads.tiktok.com/help/article/events-api?lang=en

[13] Id.

[14] https://www.microsoft.com/en-us/edge/learning-center/what-are-cookies?form=MA13I2 (last visited Dec. 23, 2024).

[15] About using cookies with TikTok Pixel, TIKTOK (last updated Jul. 2025) https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en

with your content on TikTok and can be used to enhance measurement accuracy and ad campaign optimization."[16]

38.    Specifically, TikTok highlights that its "partners share information with us about you and the actions you have taken outside of the Platform, such as your activities on other websites and apps or in stores, including the products or services you purchased, online or in person. These partners also share information with us, such as mobile identifiers for advertising, hashed email addresses and phone numbers, and cookie identifiers, which we use to help match you and your actions outside of the Platform with your TikTok account."[17]

39.    When a user visits a website that utilizes TikTok's Pixel, the Advertising Partner requests that TikTok set a cookie onto the browser or device of the person visiting the website. TikTok then links these proprietary ID numbers to the cookie and the individual with the cookie.

40.    After the cookie is loaded onto a person's browser, each time that person visits a website where the TikTok Pixel is operating, TikTok uses the cookie to identify the website visitor as the same person who visited previous websites with the same cookie installed on their browser, and thereafter matches it to a user of the TikTok App.  As such, TikTok is able to track each individual App user across multiple sites to create a more detailed profile on that person's beliefs, interests, and habits.

41.    This information is cross-referenced with other information collected by TikTok to specifically identify the individual using the device and to add this web-activity information to a larger profile on the individual to sell their profile for targeted advertising.

### 1.    IP Addresses

42.    TikTok says that it collects information from users, including their IP addresses.

43.    IP addresses are another common persistent identifier.

44.    An IP address is a unique set of numbers assigned to a device on a network, which is typically expressed as four sets of numbers separated by periods (*e.g.*, 192.168.123.132).  The

---

[16] *Id.*

[17] *Privacy Policy,* TIKTOK (last updated Aug. 19, 2024), https://www.tiktok.com/legal/page/us/privacy-policy/en

traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced. IPv6 offers a vastly larger address space with 340 undecillion possible addresses. While IPv6 adoption has been increasing, many networks still rely on IPv4.[18]

45. Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another. An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.

46. IP addresses are not freely accessible. If an individual is not actively sending data packets out, their IP address remains private and is not broadcast to the wider internet.

47. IP addresses can be used to determine the approximate physical location of a device. For example, services like iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.[19] Thus, knowing a user's public IP address—and therefore geographical location—"provide[s] a level of specificity previously unfound in marketing."[20]

48. An IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[21] and (ii) "to target specific households, businesses[,] and even individuals with ads that are relevant to their interests."[22] Indeed, "IP targeting is one of the most

---

[18] *See, e.g.*, https://www.cloudflare.com/learning/network-layer/internet-protocol/ (last visited Dec. 23, 2024); https://netbeez.net/blog/rfc1918/ (last visited Dec. 23, 2024).

[19] https://iplocation.io/ (last visited Dec. 23, 2024).

[20] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[21] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

[22] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert williams-z7bhf.

---

targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[23] because "[c]ompanies can use an IP address … to personally identify individuals."[24]

49.     In fact, an IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[25]  For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[26]

50.     "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[27]

51.     "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[28]

52.     In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's IP address because it "can be more cost-effective than other

[23] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.

[24] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.

[25] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.

[26] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.

[27] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj 0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV 5-5maUaAgtNEALw_wcB.

[28] *Id.*

forms of advertising."[29] "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[30]

53. In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[31] "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[32]

54. Putting IP addresses in the hands of a companies like TikTok is particularly invasive, as the NATO report noted:

> [a] data broker may receive information about a[] [website] user, including his … IP address. The user then opens the [website] while his phone is connected to his home Wi-Fi network. When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user. If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network. Now the data broker knows that the same individual is using both the phone and the computer, which allows it to track behavior across devices and target the user and their devices with ads on different networks.[33]

55. Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[34]

56. In other words, not only does the collection of IP addresses by Defendants cause harm in and of itself, attaching IP addresses to comprehensive user profiles, tracking Plaintiff and

---

[29] Williams, https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-williams-z7bhf.

[30] *Id.*

[31] *Id.*

[32] *Id.*

[33] TWETMAN & BERGMANIS-KORATS, *supra* at 11.

[34] Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

Class Members across the Internet using their IP addresses in conjunction with other data and compiling vast reams of other personal information in the process.

57.     For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[35]

58.     Likewise, under the California Consumer Privacy Act, IP addresses are considered "personal information" because they are "reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household."  Cal. Civ. Code § 1798.140(v)(1)(A).[36]

*2.     Mobile Advertising Identifiers*

59.     TikTok employs similar methods to track individuals using mobile apps on Android and iOS devices.

60.     TikTok owns and operates "software development kits" (SDKs), pieces of code that work independently or with "application programming interfaces" (APIs) and are loaded into mobile apps and can track users' activity on certain apps.[37]

61.     An SDK is a "set of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution."[38]

62.     An API "acts an intermediary layer that processes data transfer between systems, letting companies open their application data and functionality to external third-party developers

[35] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en.

[36] A "consumer" is defined as "a natural person who is a California resident."  Cal. Civ. Code § 1798.140(i).)  A "household" is defined as "a group … of consumers who cohabitate with one another at the same residential address and share use of common devices or services."  Cal. Civ. Code § 1798.140(1).)

[37] https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface) (last visited Dec. 23, 2024).

[38] API VS. SDK: THE DIFFERENCE EXPLAINED (WITH EXAMPLES), https://getstream.io/glossary/api-vs-sdk/.

[and] business partners."[39]  An API can "work[] as a standalone solution or included within an SDK … [A]n SDK often contains at least one API."[40]  APIs "enable[] companies to open up their applications' [or websites'] data and functionality to external third-party developers, business partners, and internal departments within their companies."[41]

63.    TikTok explains that it collects "identifiers for advertising purposes," and that its partners "also share information with us, such as mobile identifiers for advertising" that it then integrates into its profiles of App users.[42]

64.    For example, TikTok collects advertising identifiers that are designed to track the app activity of individual users across different apps. Two of the most prominent are AAIDs (for Android devices) and IDFAs (for iOS devices) (collectively, "Mobile Advertising IDs" or "MAIDs").[43]

65.    An AAID is a unique string of numbers which attaches to a device.  As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[44]  So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

66.    Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier.  The fact that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendants, Google, and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers).  Byron Tau, Means of Control: How the Hidden Alliance of Tech and Government is Creating a New American Surveillance State at 175 (2024)

---

[39] IBM, *What is an API?*, available https://www.ibm.com/topics/api.

[40] SDK VS. API: WHAT'S THE DIFFERENCE?, IBM (July 13, 2011), https://www.ibm.com/blog/sdk-vs-api/ ("SDK" stands for software development kit and "is a set of software-building tools for a specific program," while "API" stands for application programming interface).

[41] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

[42] *Privacy Policy,* TIKTOK (last updated Aug. 19, 2024), https://www.tiktok.com/legal/page/us/privacy-policy/en

[43] *See id.*

[44] https://support.google.com/googleplay/android-developer/answer/6048248 (last visited Dec. 23, 2024).

---

("Like me, most people had no idea about the 'Limit Ad Tracking' menu on their iPhones or the AAID that Google had given even Android devices.  Many still don't."); *see also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

67.    Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[45]  Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[46]

68.    Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences.  These inferences, combined with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

69.    Similarly, an "Identifier for Advertisers, or IDFA for short, is a unique, random identifier (device ID) that Apple assigns to every iOS device. An IDFA would be the equivalent of a web cookie, in the sense that it enables advertisers to monitor users' engagement with their ads, and keep track of their post-install activity."[47]

70.    As with the TikTok cookies, TikTok Pixel and AAID, TikTok's collection of IDFAs allows TikTok to track iOS users' activity across the various apps they use. Like the AAID, this data can create inferences about an individual, such as a person's political or religious affiliations, sexuality, or general reading and viewing preferences.  These inferences, combined with publicly available tools, sufficiently permits even an ordinary person to identify a specific individual with the IDFA.

---

[45]https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5 (last visited Dec. 23, 2024).

[46] https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/ (last visited Dec. 23, 2024).

[47]https://www.appsflyer.com/glossary/idfa/ (last visited Dec. 23, 2024).

71.     Regardless of whether these IDs are supposed to be anonymous, MAIDs are often combined with other identifiers to identify users in what is known as ID Bridging. "ID Bridging" is the process of "piecing together different bits of information about" a user "to confidently infer that it is the same individual accessing a publisher's site or sites from various devices or browsers."[48] That is, users can be identified and tracked by "bridging" (or linking) their MAIDs to other sources, such as e-mail addresses, geolocation, or phone numbers.



72.     ID Bridging "has long been the foundation of programmatic advertising,"[49] which is the process by which companies "use [] advertising technology to buy and sell digital ads" by "serv[ing] up relevant ad impressions to audiences through automated steps, in less than a second."[50]  It entails a "unique identifier[] assigned to individual devices," including "Google's

[48] Kayleigh Barber, *WTF Is The Difference Between Id Bridging And Id Spoofing?*, DIGIDAY (July 8, 2024, https://digiday.com/media/wtf-is-the-difference-between-id-bridging-and-id-spoofing/.

[49] https://www.adexchanger.com/data-driven-thinking/how-can-id-bridging-the-foundation-of-our-space-suddenly-be-a-bad-thing/.

[50] PROGRAMMATIC ADVERTISING, https://advertising.amazon.com/blog/programmatic-advertising#.

Advertising ID," personal information like geolocation and e-mail address, and "cross-platform linkage."[51]

73. ID Bridging is a money-making machine for advertisers and app developers. On the advertiser side, ID Bridging "increase the chances of an ad buying platform finding their inventory to be addressable and, therefore, maximizes their 'ad yields.'" And on the app developer side, "publishers can boost revenue from direct-sold campaigns by offering advertisers access to more defined and valuable audiences."[52]

74. In other words, advertisers will be able to find users that are more directly and likely interested in what is being sold by having access to significantly more information. And app users' information will be more valuable (and therefore, bring in more money to app developers) because it is combined with a plethora of other information from various sources.

75. Many companies (*e.g.*, data brokers, identity graph providers), publicly advertise their ability to conduct such bridging. And TikTok itself has touted the benefits of ID Bridging, noting that TikTok for Business users can engage in "Advanced Matching." When TikTok for Business clients use Manual Advanced Matching, they can "[m]anually control which Advanced Matching parameters you share with TikTok. To set up Manual Advanced Matching, you'll use code for each event you want to track on your website. If you're using a partner platform, you can choose these events in the data sharing settings of your partner platform."[53]

76. Alternatively, TikTok for Business clients can engage in "Automatic Advanced Matching." This "[a]utomatically identifies form fields on pages where the [TikTok] Pixel is installed, and hashes and collects the customer information entered on those pages to optimize targeting and measurement for your ad campaigns. Personal identifiable Information (such as

---

[51] Anete Jodzevica, *ID Bridging: The Privacy-First Future of Audience Targeting*, SETUPAD (Nov. 15, 2024), https://setupad.com/blog/id-bridging/. Ironically, the example given in this article is a "hashed e-mail," where the e-mail Defendant collected in this example is not hashed.

[52] Bennett Crumbling, *What Is 'ID Bridging' And How Publishers Use It To Grow Direct And Programmatic Revenue?*, OPTABLE (Aug. 22, 2024. https://www.optable.co/blog/what-is-id-bridging.

[53] *About Advanced Matching for Web*, TIKTOK (last updated Sep. 2025), https://ads.tiktok.com/help/article/advanced-matching-web?lang=en

---

name, zip, email and phone) is collected securely and safely with an industry-standard hashing algorithm (SHA-256)."[54]

77.    Put simply, ID bridging enables an advertiser to extend user identification beyond the scope of one browser or device.[55]

78.    Yet, while those within the ID Bridging industry describe it as privacy-protective, it is anything but.  As courts have noted, the "ability to amass vast amounts of personal data for the purpose of identifying individuals and aggregating their many identifiers" creates "dossiers which can be used to further invade [users] privacy by allowing third parties to learn intimate details of [users'] lives, and target them for advertising, political, and other purposes, ultimately harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them."  *Katz-Lacabe v. Oracle Am., Inc.*, 688 F. Supp. 3d 928, 940 (N.D. Cal. 2023) (cleaned up).

79.    In February 2019, Oracle published a paper entitled "Google's Shadow Profile: A Dossier of Consumers Online and Real World Life," part of which provides as accurate a description of Google's services (and TikTok's, as Defendant):

> a consumer's "shadow profile" [is a] massive, largely hidden dataset[] of online and offline activities. This information is collected through an extensive web of … services, which is difficult, if not impossible to avoid.  It is largely collected invisibly and without consumer consent.  Processed by algorithms and artificial intelligence, this data reveals an intimate picture of a specific consumer's movements, socio-economics, demographics, "likes", activities and more.  It may or may not be associated with a specific users' name, but the specificity of this information defines the individual in such detail that a name is unnecessary.[56]

---

[54] *Id.*

[55] *See, e.g.*, Budi Tanzi, *New OpenRTB Specs Ensure Identity Resolution Can Be Done Transparently With Trusted Partners*, EXPERIAN (Dec. 18, 2024), https://www.experian.com/blogs/marketing-forward/new-openrtb-specs-ensure-identity-resolution-can-be-done-transparently-with-trusted-partners/.

[56] GOOGLE'S SHADOW PROFILE: A DOSSIER OF CONSUMERS ONLINE AND REAL WORLD LIFE at 1 (Feb. 2019), https://tinyurl.com/2mtuh7vf.

80. In other words, ID Bridging is dangerous because of the sheer expanse of information being compiled by companies like TikTok without the knowledge or consent of users, all of which is being done for pecuniary gain.

### 3. Email Addresses and Phone Numbers

81. Perhaps even more invasive than any other identifier, the TikTok Pixel's mass collection of email addresses and phone numbers from websites and apps represents a grave privacy violation. The logic of this is straightforward. If TikTok collects the same e-mail address or phone number from two different site visits, it can determine with almost total accuracy that the sites are both being visited by the same person. The same is true of devices. If the same e-mail address is captured on two different devices, it is very likely those devices are used by the same individual.

82. Email addresses and phone numbers are even more persistent than the identifiers described above because they are not easily reset or changed. Advertisers know this and will pay more for such identifiers.

83. Although TikTok collects hashed SHA256[57] e-mail addresses and phone numbers, the reality is that "the match between your email and its hash is probably already circulating widely and companies are marking money from it."[58]  Given the availability online of such "leaked" email/hashed email matches, entities are merely "pretend[ing]to protect your privacy"[59] through SHA-256 and/or other hashing algorithms.

84. The Federal Trade Commission has warned companies for over a decade—including as recently as July 24, 2024—that hashing is an insufficient method of anonymizing information.[60]

---

[57] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash; *see also About Advanced Matching for Web*, TIKTOK (last updated Sep. 2025), https://ads.tiktok.com/help/article/advanced-matching-web?lang=en

[58] PIXEL DE TRACKING, GUERLAIN (LVMH): LUXURY AND SURVEILLANCE, https://www-pixeldetracking-com.translate.goog/fr/votre-email-comme-vecteur-de-surveillance-ultime-illustration-avec-guerlain?_x_tr_sl=fr&_x_tr_tl=en&_x_tr_hl=en&_x_tr_pto=sc.

[59] *Id.*

[60] Ed Felten, *Does Hashing Make Data "Anonymous"?*, Federal Trade Commission (Apr. 22, 2012), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2012/04/does-hashing-make-data-anonymous ("[H]ashing is vastly overrated as an 'anonymization' technique … the casual

---

85.    Thus, even in hashed form, email addresses are traceable to individuals.

86.    Location information functions in a similar manner.  If multiple websites or apps are visited from the same location, the pool of potential individuals who are accessing the website or app is narrowed considerably immediately and can be narrowed to a pinpoint over time.

87.    HTTP requests, when intercepted by TikTok, collect device information that can also identify whether the same user is visiting multiple sites or apps, and can distinguish between the devices being used by a particular person.  With every visit, and every subsequent HTTP request, the device information will be identical in each.

## B. Interception of Communications

88.    The TikTok Pixel also intercepts millions of communications with websites and apps through the interception of full-string URLs, "button click" events, and "Add to Cart" events.

### 1. Universal Resource Locators

89.    TikTok collects collects information such as a user's "activities on other websites and apps or in stores." In collecting "activities on other websites," TikTok's Advertising Partners' tags and tag manager solutions are collecting the Universal Resource Locator (URL) of the webpages visited by each TikTok App user.

90.    Sometimes known as a "web address," the URL is the name of the webpage as displayed in the address bar of a browser.

91.    Each page on a website has its own individual URL, allowing tags with access to the URL to see which pages of a website a particular internet user visited.

92.    All URLs identify the pages of each page of a website an internet user visited.

93.    For example, when viewing an article on the Zillow website, the full name of the Article is included in the URL:

---

assumption that hashing is sufficient to anonymize data *is risky at best, and usually wrong.*") (emphasis added); *No, Hashing Still Doesn't Making Your Data Anonymous*, Federal Trade Commission (July 24, 2024) ("[H]ashes aren't 'anonymous' and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized.").



referer
https://www.zillow.com/homedetails/11726-Balboa-Blvd-Granada-Hills-CA-91344/20110219_zpid/

94.    As such, any tag that intercepts the URL on this page also intercepts the user's communication with the website.  This process works similarly on other websites.

95.    TikTok, through its Advertising Partners' tags and tag manager solutions, collects the URLs and any information that can be gleaned or inferred from those URLs are added to the profiles that TikTok has for that particular individual.

### 2.  Button Clicks

96.    The TikTok pixel can also be configured to intercept the specific buttons a user clicks on a website or app.

97.    For example, when an individual is sending money on the Western Union website and clicks the "Send Now" button, that action is intercepted by the TikTok Pixel.



```
        },
        "action": "Click",
        "auto_collected_properties": {
                "page_trigger": "Click",
                "trigger_element": {
                        "tag": "A",
                        "attributes": {
                                "class": "wu-button
wu-button_primarywu-button_primary--<#RACE_ETHNIC#>d-inline-block
w-100text-decoration-nonetext-center receiver_join_now_ctam-0",
                                "destination":
"/us/en/web/user/register?ReceiveCountry=AR&ISOCurrency=ARS&SendAmount=237&funds-out=
DB&funds-in=AC"
                        },
                        "inner_text": "Send now",
```

98.     As such, each "button click" event allows TikTok to intercept specific communications between the individual and a website or app.

### 3.  Add to Cart Events

99.     Similar to button click events, the TikTok Pixel captures when a person on a retail website takes the affirmative action of adding items to their online shopping cart.

100.     While this may seem innocuous, that information can reveal sensitive information about a person. For example, on musely.com, a provider of prescription skincare medication, the add to cart event effectively communicates which prescription medication is being purchased.

```
"page": {
        "url": "https://www.musely.com/spotcream",
        "referrer": "https://www.musely.com/darkspots"
```

```
"page_trigger": "Click",
"trigger_element": {
        "tag": "BUTTON",
        "attributes": {
                "class": "var-button var--box var-button--normal var--flex var-button--block
imary var-elevation--0",
                "type": "button"
        },
        "inner_text": "ADD TO CART",
```

101.    On information and belief, the TikTok pixel collects similar information on hundreds of websites.

## III.    TIKTOK'S ADVERTISING PRODUCTS

102.    TikTok does not collect such a wide breadth of information for no reason, it uses the information it collects to target advertising on and off TikTok.

### A.  TikTok for Business

103.    TikTok for Business is TikTok's business suite of tools. It offers marketing solutions to advertisers, sellers and creators who wish to advertise, sell or create content on TikTok.

104.    Part of the TikTok for Business platform is TikTok Ads Manager, which provides "tools for creat[ing] ad campaigns, manag[ing] ad resources, monitor[ing] data, and optimiz[ing] your advertising."

105.    TikTok Ads Manager also comes with measurement and analytics capabilities, which it calls "Audience Insights."

106.    "Audience Insights" provide "aggregated information about TikTok users that have been active within the last 30 days, based on all TikTok data, paid and organic, and is not based on campaign-level information. With Audience Insights you can explore TikTok user interests, behaviors, and demographics to maximize results and find new ways to scale. Audience demographics, location, interests, device, and activity are estimated based on factors like user behavior on the app, the information provided by users, and device information."[61]

107.    By using Audience Insights, an advertiser or seller can "explore aggregate audience information" effectively, such as by researching "the top 10 [hashtags] your TikTok audience is interested in" or by "[f]ilter[ing] your audience by those who have interacted with a hashtag, by category of creators, by engagement (those who have watched, liked, commented or shared a video)."[62]

---

[61] *About Audience Insights*, TikTok (last updated Apr. 2025)
https://ads.tiktok.com/help/article/audience-insights?lang=en

[62] *Introducing Audience Insights: Maximize results and scale,* TikTok (last updated Nov. 15, 2022)
https://ads.tiktok.com/business/en-US/blog/audience-insights-maximize-results-scale

---

108.    TikTok also offers the "Custom Audiences" functionality, a "tailored targeting feature that enables advertisers to create audiences of known or engaged users using a file upload, website or app activity, TikTok engagement, or an audience activation partner."[63] Through TikTok's "Custom Audience" feature, advertisers and sellers can "[l]earn about audiences who have seen, clicked, or engaged with your content or audiences you've uploaded via Customer File."[64]

109.    A Customer File is, essentially, a set of data that an advertiser or seller possesses. By uploading a Customer File to their TikTok for Business account, a seller or advertiser is able to "find users in the TikTok system that match with the IDs on your uploaded list. Your uploaded list can contain identifiers such as email address, phone, or Mobile Advertising IDs (MAIDs)."[65]

110.    In other words, TikTok compiles comprehensive data on its users through their interactions within the App.  TikTok then augments or matches the information of its end users with profile data provided by TikTok Ad Manager clients to make that information more valuable to advertisers by aggregating that information into a consolidated profile, thereby driving advertisers' revenue.

111.    TikTok claims its ad targeting allows TikTok for Business clients to "deliver ads to specific people based on: Demographics, Audience Targeting, Advanced Targeting, Device type and Smart targeting."[66]

112.    In terms of demographic targeting, TikTok allows its clients to reach audiences based on: (1) age, segmenting its audiences into 13-17, 18-24, 25-34, 35-44, 45-54, 55+; (2) gender, segmenting its audiences into male or female; (3) location, segmenting its audience based

---

[63] *About Custom Audiences,* TIKTOK (last updated Nov. 2025)
https://ads.tiktok.com/help/article/custom-audiences?lang=en

[64] *Introducing Audience Insights: Maximize results and scale,* TIKTOK (last updated Nov. 15, 2022)
https://ads.tiktok.com/business/en-US/blog/audience-insights-maximize-results-scale

[65] *How to create a Custom Audience with a customer file,* TIKTOK (last updated Sep. 2025)
https://ads.tiktok.com/help/article/how-to-create-a-custom-audience-with-a-customer-file?lang=en

[66] *About Ad Targeting in TikTok Ads Manager*, TIKTOK (last updated May 2025)
https://ads.tiktok.com/help/article/pangle-placement?lang=en

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                             22

on location (Country/Region, State/Province, City, and Designated Market Area/DMA (US Only)); (4) language, segmenting its audience based on the language of users' TikTok app and/or their predicted language based on the content viewed; (5) spending power, segmenting its audience based on their purchase behavior through TikTok ads; and (6) household income: delivering ads to users based on household income.[67]

113.   TikTok also offers what it calls Advanced Targeting, which allows its clients to reach audiences based on interests, purchase intent, behaviors (i.e., recent-in app behavior such as interactions with videos or creators, video behaviors such as watching, liking, commenting, and sharing videos by category, and creator interactions such as following or viewing creator profiles by category, such as travel or sports).[68]

114.   TikTok's Advanced Targeting is a form of audience segmentation, otherwise understood as "the process of grouping people based on shared characteristics. These groups, or audience segments, can be used to create more targeted campaigns, and tailored messaging that resonate with your target audiences."[69]

115.   By breaking its audience down into categories by numerous metrics, TikTok is able to better monetize its user base and target personalized advertising to them for profit.

116.   TikTok's audience segmentation capabilities are made possible by the information it collects from users and also third parties.

**B. Identity Resolution**

117.   In addition to its own tracking of App users across the internet, TikTok engages in a process known as identity resolution – what it calls Advanced Matching.

118.   Identity resolution is the technology marketing term for the process of data tracking described above. As TikTok describes it:

> Advanced Matching is a feature that helps you match customer information such as email, phone number, and other identifiers with actions people take on your website. You can match this information

---

[67] *Id.*

[68] *Id.*

[69] *Audience segmentation: How to perfect it for your marketing,* GWI (last accessed Jan. 2026), https://www.gwi.com/blog/audience-segmentation

with events shared through the TikTok Pixel, Events API or partner platforms.[70]

119.    In plain language, identity resolution is the culmination of TikTok's and its Advertising Partners' tracking, where TikTok matches an App user to a larger record of their web and app activity for the purpose of targeted advertising.

120.    Once sufficient data has been collected on an individual, TikTok monetizes the individual's data in a number of ways.  One way is to provide individuals' identities and web browsing information to its Advertising Partners to assist with those companies' serving targeted ads to internet users.

121.    When an Advertising Partner implements TikTok's Pixel, cookies or technology on its website, TikTok compiles the information of users interacting with an Advertising Partner's technology or trackers on that website. It then synthesizes that data with its existing data on a user.

122.    As *Consumer Reports* noted, TikTok's tracking is pervasive:

> If you go to the United Methodist Church's main website, TikTok hears about it. Interested in joining Weight Watchers? TikTok finds that out, too. The Arizona Department of Economic Security tells TikTok when you view pages concerned with domestic violence or food assistance. Even Planned Parenthood uses the trackers, automatically notifying TikTok about every person who goes to its website, though it doesn't share information from the pages where you can book an appointment.[71]

123.    With respect to the delivery of targeted advertisements on websites and its own App, TikTok's ID syncing makes the entire real-time-bidding process possible by identifying the individual visiting the site and providing information about their web activity and interests.  This creates the basis for hyper-targeted advertising related to that activity and those interests to be

---

[70] *About Advanced Matching for Web*, TikTok (last updated Sep. 2025), https://ads.tiktok.com/help/article/advanced-matching-web?lang=en

[71] *How TikTok Tracks You Across the Web, Even If You Don't Use the App*, Consumer Reports (last updated Sep. 2022), https://www.consumerreports.org/electronics-computers/privacy/tiktok-tracks-you-across-the-web-even-if-you-dont-use-app-a4383537813/#:~:text=A%20Consumer%20Reports%20investigation%20finds,don't%20have%20TikTok%20accounts.

served. This ultimately benefits the website or app operator, as it makes their userbase more valuable because said users have been further identified and linked to other activity via the tags and tag manager solutions.

124. For these processes to happen, TikTok must necessarily share the information it collects on individual internet users with its partners.

125. The identity resolution service aids in the wiretapping and surveillance conducted by the Advertising Partners.

### C. Information Shared Outside of TikTok's Ad Network

126. TikTok also enriches its detailed advertising profiles by exchanging information with independent advertising technology companies.

127. For example, TikTok receives "segment" information, information about a which categories a particular person can be placed, from Permutive and advertising technology company specializing in data aggregation and sales.

128. This creates an additional privacy violation because the information shared by TikTok with Permutive and similar entities is added to those entities' data profiles and is sold to other companies, disseminating the information far further than TikTok's own advertising network.

\* \* \*

129. To summarize the proceeding allegations, Defendants deploy the TikTok pixel on hundreds or thousands of websites to collect as much information about users as possible to create comprehensive user profiles. These profiles are shared by Defendants with other entities (and vice versa) to compile as many details and attributes as possible. The profiles are offered up for sale to advertisers on TikTok's ad network, where they become increasingly more valuable as advertisers know more about the user. Thus, Defendants increases the price premium that advertisers are willing to pay because Defendants' ability to match users up to comprehensive profiles allows users to be identified and more directly targeted based on an assortment of identifiers and interests.

130. Accordingly, Defendants are using its Trackers in conjunction with website and mobile application operators and to (i) de-anonymize users, (ii) offer users up for sale for targeted advertising , and (iii) allow website operators to maximum revenue by installing Defendants'

Trackers and allowing the Defendants to collect as much information about users as possible without consent.[72]

131.    Of course, Defendants also benefit from this arrangement because websites and apps will want to employ Defendants' services to bring in more advertising revenue, meaning Defendants can continue to expand and grow the information they have about any consumers and add to consumers' profiles, which further perpetuates the value of TikTok's services.

## IV.    DEFENDANTS' TRACKERS ARE PRESENT ON EACH OF THE SUBJECT WEBSITES AND ACROSS THE INTERNET

132.    As part of their investigation, Plaintiff's counsel found and conducted testing on several websites to provide a sample of the widespread tracking and wiretapping of, and targeted advertising to, millions of Americans by Defendants.  For each of the websites tested, there are hundreds or thousands of others where the same or similar information is collected.

133.    Thus, the conduct alleged in this Complaint is *not* limited to the specific websites alleged below.  Indeed, even Plaintiff visited other websites where Plaintiff's counsel found TikTok would have tracked them.  Instead, these websites are merely examples of the types of data that TikTok collects, and the ways in which it surveils users across the Internet.

### A.    Zillow

134.    Zillow is an online real estate listing website, where website visitors can view properties to rent or buy and interact with landlords and real estate agents.

135.    Unbeknownst to website visitors, the TikTok Pixel is loaded onto each page of the Zillow website.

---

[72] Any purported "consent" obtained by third-party websites via cookie banners is invalid because those: (i) those often fail to honor the user's selected preference; (ii) fail to disclose data is being sent to an unknown number of  enities for identity resolution; and (iii) TikTok is a third party to that interaction, engaging in the recording or decoding of data it has no direct right to access.

136.    The TikTok Pixel immediately loads tracking cookies onto the individual's browser in the manner described herein

**Cookies:**
_ttp       39GnEJ90UZ1yjuaPvxfzuZEFPxZ

137.    The TikTok Pixel also intercepts the detailed, full-string URL from each page of the Zillow website a user visits, as detailed above, thereby intercepting the user's communications with the website regarding which properties they are interested in.

zillow.com/apartments/sacramento-ca/zeta-luxury-apartments/CkCQ9Z/

```
"page": {
        "url":
"https://www.zillow.com/apartments/sacramento-ca/zeta-luxury-apartments/CkCQ9Z/",
```

138.    The TikTok Pixel also collects the user's browser and device information in the manner described above.

139.    If a user enters their information to request a property tour or receive information from an agent, the TikTok Pixel also intercepts a hashed version of the users' email address and phone number.

```
                },
                "device": {
                        "platform": "pc"
                },
                "user": {
                        "anonymous_id": "01KGTH6Z4J0HAF8V4HX4M7Q1Z0_.tt.1",
                        "auto_email":
"2a9a22d88b031064ea86ff104d1cabf6b14a866c2a4adf136def1330b49fecbb",
                        "auto_phone_number":
"5f079bc3cd4652660c0677f186efee3feec37586971d7c218dc93c06dfaf9504"
                },
```

140.    Defendants then uses the information it collects to link the user to a de-anonymized profile and adds any new information to that profile. This profile is connected to the ID assigned to the individual, and to the individual's email address and phone number, and added to Defendants' advertising products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed— and Zillow—as its users are more valuable now that their information is being connected to Defendants' vast repository of information.

141.    In addition, because of the setting of cookies and collecting of the user's device information, email address, and phone number, Defendants track the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the advertising process.

### B. Western Union

142.    Western Union is a website where users can send money both domestically and internationally.

143.    Unbeknownst to website visitors, the TikTok Pixel is loaded onto each page of the Western Union website.

144.    The TikTok Pixel immediately loads tracking cookies onto the individual's browser in the manner described herein.

```
_ttp    30pEDxpG3EDRvUQ6vFJwHALASr2
```

145.    The TikTok Pixel also collects the user's browser and device information in the manner described herein.

146.    The TikTok Pixel also intercepts a hashed version of the user's email address and phone number as described herein.



jsb_status : 2
},
"device": {
        "platform": "pc"
},
"user": {
        "anonymous_id": "01KBMV947YJF44NH2GHXFMG11P_.tt.1",
        "auto_email":
"39184a70a40f90487662fa95308aa78643adac3d5e26fe478d6510bc716106b5",
        "auto_phone_number":
"df4973b151a604b53d633203cf5c0f86859bfe6a9cbb88c1eb0a13c95c3f22f4"

147.    The TikTok Pixel also intercepts full-string detailed URLs from the Western Union website. Notably, intercepting the URL means that TikTok is intercepting the amount sent and the currency exchange requested.

},
        "page": {
                "url":
"https://www.westernunion.com/us/en/web/user/register?ReceiveCountry=AR&ISOCurrency=ARS
SendAmount=237&funds-out=DB&funds-in=AC",

148.    The TikTok Pixel also collects numerous button click events on the Western Union website, as described herein.

"action": "Click",
"auto_collected_properties": {
        "page_trigger": "Click",
        "trigger_element": {
                "tag": "BUTTON",
                "attributes": {
                        "class": "btn btn-primary btn-lg
tn-blockbackground-color-tealdtm_wuregisterdefaultborder-btn-color ng-star-inserted",
                        "id": "button-continue",
                        "type": "submit"
                },
                "inner_text": "Register",

149. The TikTok Pixel also engages in identity resolution and cookie syncing with the Tapad Pixel on the Western Union Website, as described herein.

150. Defendants then uses the information it collects to link the user to a de-anonymized profile and adds any new information to that profile. This profile is connected to the ID assigned to the individual, and to the individual's email address and phone number, and added to Defendants' advertising products described herein. This data added to an individual's profile increases its value to advertisers—who can serve ads related to these keywords, sentiments, and information viewed— and Western Union—as its users are more valuable now that their information is being connected to Defendants' vast repository of information.

151. In addition, because of the setting of cookies and collecting of the user's device information, and email address, Defendants track the future web activity of the individual and adds that information to its consumer profiles and tracking products, as well as connecting that information to users being offered up for sale to advertisers as part of the advertising process.

## V. PLAINTIFF'S EXPERIENCE

152. Plaintiff Lisa Tsering, while in California, visited at least 35 websites where Defendants' TikTok Pixel was present, including websites where Defendants gather a wide variety of sensitive information on Plaintiff such as Zillow.com, wyndamhotels.com, Healthline.com, Hertz.com, Redfin.com and Hrblock.com.

153. On each of these websites, TikTok pixel operated in the manner described above, setting cookies on Plaintiff Tsering's browser, so she can be identified on other websites, and intercepting her communications with the websites, and collecting identifying information such as her email address and phone number.

154. Specifically, at a minimum, TikTok intercepted Plaintiff Tsering's email address and the detailed URLs regarding each property she viewed on the Zillow website, loaded cookies on her browser, and shared the collected information with other parties.

155. Data taken from Plaintiff Tsering's browser confirms she was tracked by Defendants, as she had multiple TikTok Cookies loaded onto her browser.

156. Defendants used the information collected by the TikTok Pixel to:

(a)    identity Plaintiff Tsering and either create a new profile of her or match her to a pre-existing profile (either in the Defendants' own databases or with another entity's profile);

(b)    enable each website and Partner Trackers to sell Plaintiff Tsering's information to advertisers for hyper-targeted advertising based on the information collected by the TikTok Pixel on the websites and the information contained on any profiles of Plaintiff (which are linked to Plaintiff Tsering via the information collected by Defendants on the websites and apps);

(c)    enable the websites and Partner Trackers to target Plaintiff Tsering with advertisements and serve advertisements on Plaintiff Tsering based on the information collected and the information contained on any profiles of Plaintiff Tsering (which are linked to Plaintiff via the information collected by Defendants on the websites and apps); and

(d)    de-anonymize Plaintiff Tsering and generate revenue from the sale of her information—both what is collected on the websites and the profiles this information is linked to—to advertisers, thus boosting the websites' and apps' revenue and the value of Defendants' services.

157.    By using the cookies loaded onto Plaintiff Tsering's browser, Defendants also tracked her future web browsing activity across the internet and assisted other Partner Trackers in tracking her and wiretapping her communications with websites.

158.    Plaintiff Tsering was unaware that Defendants were installing trackers on her browser, aiding in the wiretapping of her communications, deanonymizing her personal data, or collecting, selling, and disclosing her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendants.  Nor could she have discovered these facts.

159.    Plaintiff Tsering did not provide her prior consent to Defendants to install trackers on her browser, aid in the wiretapping of her communications, deanonymize her personal data, or collect, sell, and disclose her personal data, to advertising technology companies, other data brokers, or any person or entity doing business with Defendants.  Nor did Defendants obtain a court order to do the same.

160.    Plaintiff Tsering has, therefore, had her privacy invaded by Defendants' violations of the CIPA and ECPA, and Defendants have been unjustly enriched by enabling the disclosure and sale of the improperly collected data concerning Plaintiff Tsering.

## CLASS ALLEGATIONS

161.    **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as follows:

> All persons in the United States who visited a website or mobile application where the TikTok Pixel was present.

162.    **California Subclass**: Plaintiff also seeks to represent a subclass of similarly situated individuals defined as follows:

> All California residents who visited a website or mobile application where the TikTok Pixel was present while in California.

163.    The Class and California Subclass shall be collectively referred to as the "Classes," and Members of the Class and Subclass will collectively be referred to as "Class Members," unless it is necessary to differentiate them.

164.    Excluded from the Classes are Defendants, any affiliate, parent, or subsidiary of any Defendant; any entity in which any Defendant has a controlling interest; any officer director, or employee of any Defendant; any successor or assign of any Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

165.    **Numerosity**.  Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff currently; however, it is estimated that there are tens or hundreds of millions of individuals in the Classes.  The identity of such membership is readily ascertainable from Defendants' records and non-party records, such as those of Defendants' customers and advertising partners.

166.    **Typicality**.  Plaintiff's claims are typical of the claims of the Classes.  Plaintiff, like all Class Members, had her information collected and made available for sale by Defendants using comprehensive user profiles compiled about Plaintiff.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                    32

167. **<u>Adequacy</u>**. Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Classes. Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation generally and in the field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

168. **<u>Commonality/Predominance</u>**. Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members because Defendant has acted on grounds generally applicable to the Classes. Such generally applicable conduct is inherent in Defendant's wrongful conduct. Questions of law and fact common to the Classes include:

(a) Whether Defendants' acts and practices alleged herein constitute egregious breaches of social norms;

(b) Whether Defendants acted intentionally in violating Plaintiff's and Class Members' privacy rights under the California Constitution or common law;

(c) Whether Defendants were unjustly enriched because of their violations of Plaintiff's and Class Members' privacy rights; and

(d) Whether Plaintiff and Class Members are entitled to damages under CIPA or any other relevant statute;

169. **<u>Superiority</u>**: Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action. Plaintiff knows of no special difficulty to that would be encountered by litigating this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION
### COUNT I
**Intrusion Upon Seclusion**

170.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

171.    Plaintiff brings this claim individually and on behalf of the Classes against Defendants.

172.    Plaintiff brings this claim pursuant to California law.

173.    To state a claim for intrusion upon seclusion "[Plaintiff] must possess a legally protected privacy interest … [Plaintiff's] expectations of privacy must be reasonable … [and Plaintiff] must show that the intrusion is so serious in 'nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms." *Hernandez v. Hillsides, Inc*. 47 Cal. 4th 272, 286-87 (2009).

174.    Plaintiff and Class Members have an interest in: (i) precluding the dissemination and/or misuse of their sensitive, confidential communications and information; and (ii) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to highly intrusive surveillance at every turn.

175.    By conducting such widespread surveillance, Defendants intentionally invaded Plaintiff's and Class Members' privacy rights, as well as intruded upon Plaintiff's and Class Members' seclusion.

176.    Plaintiff and Class Members had a reasonable expectation that their communications, identities, personal activities, and other data would remain confidential.

177.    Plaintiff and Class Members did not and could not authorize Defendants to intercept data on every aspect of their lives and activities.

178.    The conduct described herein is highly offensive to a reasonable person and constitutes an egregious breach of social norms, specifically including the following:

      a.    Defendants engage in widespread data collection and interception of Plaintiff's and Class Members' internet and

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                                34

app activity, including their communications with websites and apps, thereby learning intimate details of their daily lives based on the massive amount of information collected about them.

b.     Defendants create comprehensive profiles based on this online and offline data, which violates Plaintiff's and Class Members' common law right to privacy and the control of their personal information.

c.     Defendants sell or discloses improperly collected data about Plaintiff and Class Members, to an unknown number of advertisers for use in the Defendants' advertising network which likewise violates Plaintiff's and Class Members' common law right to privacy and the control of their personal information.

179.     Defendants' amassment of electronic information reflecting all aspects of Plaintiff's and Class Members' lives into profiles for future or present use is in and of itself a violation of their right to privacy considering the serious risk these profiles pose to their autonomy.

180.     In addition, those profiles are and can be used to further invade Plaintiff's and Class Members' privacy by, for example, allowing third parties to learn intimate details of their lives and target them for advertising, political, and other purposes, as described herein, thereby harming them by selling this data to advertisers and other data brokers without their consent.

181.     Accordingly, Plaintiff and Class and California Subclass Members seek all relief available for invasion of privacy claims under common law.

## COUNT II
### Violation Of The California Invasion of Privacy Act
### Cal. Penal Code § 631(a)

182.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

183.     Plaintiff brings this claim individually and on behalf of the California Subclass against Defendants.

184.     The California Legislature enacted the CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has

created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

185. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas*, 38 Cal. 3d at 363 (emphasis added, internal quotations omitted). This restriction is based on the "substantial distinction … between the secondhand repetition of the contents of a conversation and *its simultaneous dissemination to an unannounced second auditor*, whether that auditor be a person or mechanical device." *Id*. at 361 (emphasis added). Such "simultaneous dissemination" "denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements." *Id*.; *see also Reporters Committee for Freedom of Press*, 489 U.S. at 763 ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

186. Further, "[t]hough written in terms of wiretapping, Section 631(a) applies to Internet communications." *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022). Indeed, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013). This accords with the fact that "the California Supreme Court has [] emphasized that all CIPA provisions are to be interpreted in light of the broad privacy-protecting statutory purposes of CIPA." *Javier*, 2022 WL 1744107, at *2. "Thus, when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection." *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

187. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

188. To avoid liability under CIPA § 631(a), a defendant must show it had the consent of *all* parties to a communication, and that such consent was procured *prior to* the interception occurring. *See Javier*, 2022 WL 1744107, at *2.

189. Defendants' Trackers are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

190. Defendants are each a "separate legal entity that offers [a] 'software-as-a-service' and not merely [] passive device[s]." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Further, Defendants have the capability to use the wiretapped information for a purpose other than simply recording the communications and providing the communications to website operators. Accordingly, TikTok was a third party to any communication between Plaintiff and California Subclass Members, on the one hand, and any of the websites at issue, on the other. *Id*. at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

191. At all relevant times, Defendants willfully and without the consent of all parties to the communication, and in an unauthorized manner, read, attempted to read, and learned the contents of the electronic communications of Plaintiff and California Subclass Members, on the one hand, and

the websites at issue, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

192. At all relevant times, Defendants use those intercepted communications, including but not limited to building comprehensive user profiles that are offered for disclosure or sale to prospective advertisers.

193. The TikTok Pixel is programmed so that each event (pageview, button click, etc.) functions the same way across websites. Each event is triggered simultaneously with the user's corresponding action on a website and any intercepted information is therefore intercepted in real time.

194. Plaintiff and California Subclass Members did not provide their prior consent to Defendants' intentional interception, reading, learning, recording, collection, and usage of Plaintiff's and California Subclass Members' electronic communications.

195. The wiretapping of Plaintiff and California Subclass Members occurred in California, where Plaintiff and California Subclass Members accessed the websites, where Defendants' Tracker was loaded on Plaintiff's and California Subclass Members' browsers, and where Defendants routed Plaintiff's and California Subclass Members' electronic communications to Defendants' servers.

196. Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendants' violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendants' violations of CIPA § 631(a).

## COUNT III
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632

197. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

198. Plaintiff brings this claim individually and on behalf of the proposed California Subclass against Defendants.

199. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    38

200.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

201.    Plaintiff's and Class members' communications to websites and mobile applications, including their sensitive personal and financial information, were confidential communications for purposes of § 632, because Plaintiff and Class Members had an objectively reasonable expectation of privacy in this data.

202.    Plaintiff and Class Members expected their communications to be confined to the websites and mobile applications in part, due to the protected nature of the information at issue. Plaintiff and Class Members did not expect Defendants to secretly eavesdrop upon or record this confidential information and their communications.

203.    TikTok's tracking technology, i.e., the TikTok Pixel and TikTok Cookies, are all electronic amplifying or recording devices for purposes of § 632.

204.    By contemporaneously intercepting and recording Plaintiff's and Class Members' confidential communications to websites and mobile applications through this technology, Defendants eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

205.    At no time did Plaintiff or Class Members consent to Defendants' conduct, nor could they reasonably expect that such a vast swath of their online communications would be overheard or recorded by Defendants.

206.    Defendants utilized Plaintiff's and Class Members' sensitive personal and financial information for its own purposes, including for the construction of profiles and for targeted advertising.

207.    Plaintiff and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

208. Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and Class Members' sensitive data has been collected, viewed, accessed, stored, compiled, and widely sold and disseminated by Defendants, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law. Plaintiff and Class Members are accordingly entitled to injunctive relief.

## COUNT IV
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 638.51(a)

209. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

210. Plaintiff brings this claim individually and on behalf of the proposed California Subclass against Defendants.

211. CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

212. A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

213. A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication." Cal. Penal Code § 638.50(c).

214. In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

215. For example, if a user sends an email, a "pen register" might record the email address it was sent from, because this is the user's *outgoing* information. On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from, because this is *incoming* information that is being sent to that same user.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    40

216.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that particular telephone line.  As technology has advanced, however, courts have expanded the application of these surveillance devices.  Indeed, Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme." *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013).

217.    Accordingly, courts have applied the CIPA to internet tracking technologies, including CIPA § 638.50, to trackers similar to those at issue here.  *See*, *e.g.*, *Deivaprakash v. Condé Nast Digital*, --- F. Supp. 3d ---, 2025 WL 2541952, at *2-3 (N.D. Cal. Sept. 4, 2025) (finding tracker that collected IP address and device information was a "pen register" within the meaning of CIPA); *Fregosa v. Mashable, Inc.*, 2025 WL 2886399, at *1, *5-6 (N.D. Cal. Oct. 9, 2025) (same); *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (same); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Riganian v. LiveRamp Holdings, Inc.*, 2025 WL 2021802, at *11-12 (N.D. Cal. July 18, 2025) (same); *Scarlett v. Future US, LLC*, 2025 WL 2614587, *4-5 (San Francisco Cnty. Super. Ct. Sept. 5, 2025) (same); *Rose v. Variety Media, LLC*, 2025 WL 2794920, at *2-3 (Los Anges Cnty. Super. Ct. Sept. 24, 2025) (same); *Lesh v. Cable News Network, Inc.*, 767 F. Supp. 3d 33, 40-42 (S.D.N.Y. 2025) (Marrero, J.) (finding trackers similar to those here are "pen registers" under the CIPA); *Moody v. C2 Educ. Sys. Inc.*, 742 F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register");

218.    The TikTok Cookies installed on Plaintiff's and California Subclass Members' browsers are "pen registers" because they are "device[s] or process[es]" that "capture" the "routing, addressing, or signaling information"—the IP address, geolocation, device information, and other persistent identifiers—from the electronic communications transmitted by Plaintiff's and California Subclass Members' computers or smartphones.  Cal. Penal Code § 638.50(b).

219. The TikTok Pixels installed on the websites and apps are "pen registers" because they are "device[s] or process[es]" that "capture" the "routing, addressing, or signaling information"—the IP address, geolocation, user mail addresses, and user phone numbers—from the electronic communications transmitted by Plaintiff's and California Subclass Members' computers or smartphones. Cal. Penal Code § 638.50(b).

220. At all relevant times, Defendants used the TikTok Pixels and Cookies—which are pen registers—installed on Plaintiff's and California Subclass Members' browsers, which enabled Defendant to collect Plaintiff's and California Subclass Members' IP addresses, geolocation, device information, email addresses, phone numbers, and other persistent identifiers from the websites and apps they visited. Defendants used the Trackers to build comprehensive user profiles, which were used to unjustly enrich Defendants and its clients by linking and enhancing Plaintiff's and California Subclass Members' data when it is provided to advertisers through TikTok's Business Tools.

221. Plaintiff and California Subclass Members did not provide their prior consent to Defendants' installation or use of the TikTok Pixel or any other tracking technology at issue.

222. Defendants did not obtain a court order to install or use the TikTok Pixel or any other tracking technology at issue.

223. Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass Members have been injured by Defendants' violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendants' violations of CIPA § 638.51(a).

## COUNT V
### Violation of California's Unfair Competition Law
### Cal. Bus. & Prof. Code § 17200, *et seq*.

224. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

225. Plaintiff brings this claim individually and on behalf of the Class against Defendants and on behalf of the California Subclass against Defendants.

226. In both cases, Plaintiff brings this claim pursuant to California law.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    42

227.    By committing the acts and practices alleged herein, namely surreptitiously surveilling on Plaintiff and Class Members and selling their information to numerous entities for advertising, Defendants violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.* as to Plaintiff and the Class, by engaging in unlawful and unfair conduct.

228.    Defendants violated the UCL's proscription against engaging in **unlawful business practices** as a result of its violations of (1) the Electronic Communications Privacy Act, 18 U.S.C. §§ 2511(1); (2) the California Invasion of Privacy Act, Cal. Pen. Code §§ 631, 632, and 638.51; and (3) The California Constitution and common law.

229.    Defendants' acts and practices described above also violate the UCL's proscription against engaging in **unfair business practices.** Defendants intentionally surveilled nearly every area of Plaintiff's and Class Members' lives, created permanent, non-anonymous profiles using that information, and sold that information to an unknown number of entities. Defendants' conduct is thus substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive and unscrupulous as the gravity of the conduct outweighs any alleged benefits.

230.    Pursuant to California Business and Professional Code § 17203, Plaintiff and Class Members seek an order of this Court that includes, but is not limited to, requiring Defendants to: (a) provide restitution to Plaintiff and Class Members; (b) disgorge all profits obtained as a result of its violations of the UCL; and (c) pay Plaintiff's and the Class's attorneys' fees and costs.

231.    To the extent Plaintiff does not have an adequate remedy at law, she pleads her claims under the UCL in the alternative to their legal claims. Legal remedies available to Plaintiff and Class Members are inadequate because they are not equally prompt and certain and in other ways as efficient as equitable relief. Damages are not as equally certain as restitution because the standard that governs restitution is different than the standard that governs damages. Hence, the Court may award restitution even if it determines that Plaintiff failed to sufficiently adduce evidence to support an award of damages. Damages and restitution are not the same amount. Equitable relief, including restitution, entitles Plaintiff to recover all profits from the wrongdoing, which may exceed the available damages at law.

**COUNT VI**
**Violation of the Electronic Communications Privacy Act**
**18 U.S.C. §§ 2511(1), *et seq.***

232.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

233.    Plaintiff brings this claim individually and on behalf of the Classes against Defendants.

234.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

235.    The ECPA protects both the sending and the receipt of communications.

236.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

237.    The transmission of Plaintiff's website page visits, selections, purchases and persistent identifiers to each website each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

238.    The transmission of this information between Plaintiff and Class members and each website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectric, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

239.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

240.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

241.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication."  18 U.S.C. § 2510(5).

242.    The following instruments constitute "devices" within the meaning of the ECPA:

- The TikTok Pixel;

- Any other tracking code, API, or SDK used by Defendants;

- Each Partner Tracker and advertising partner;

- The plan Defendants carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Websites and apps.

243.    Plaintiff and Class Members' interactions with each website are electronic communications under the ECPA.

244.    By utilizing the TikTok Pixel, as described herein, Defendants intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

245.    Defendants intercepted communications that include, but are not limited to, communications to/from Plaintiff and Class members regarding their food and restaurant preferences, cookware shopping habits, consumption of media, geolocation, and many more.  This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things.

246.    By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

247.    Defendants intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, intrusion upon seclusion, CIPA, and other state wiretapping and data privacy laws, among others.

248.    The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, "[t]he association of Plaintiff's data with preexisting user profiles is a further use of Plaintiff's data that satisfies [the crime-tort] exception," because it "violate[s] state law, including the [CIPA], intrusion upon seclusion, and invasion of privacy." *Brown v. Google, LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021); *see also Marden v.LMND Medical Group, Inc.*, 2024 WL 4448684, at *2 (N.D. Cal. July 3, 2024); *R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 902 (C.D. Cal. 2024).

249.    Defendants were not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

250.    Plaintiff and Class Members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy.  Plaintiff and Class members had a reasonable expectation that Defendants would not intercept their communications and sell their data to dozens of parties without their knowledge or consent.

251.    The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. §§ 2511(1), *et seq*.

252.    As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. §§ 2510, *et seq*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all Class Members, seeks judgment against Defendants, as follows:

(a)    For an order certifying the Classes pursuant to Fed. R. Civ. P. 23, naming Plaintiff as the representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes.

(b)    For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(c)    For compensatory, punitive, and statutory damages in

amounts to be determined by the Court and/or jury;

(d)    For pre- and post-judgment interest on all amounts awarded; and

(e)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated:  February 20, 2026                    Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: */s/ Philip L. Fraietta*
          Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
50 Main St., Ste. 475
White Plains, NY 10606
Telephone: (914) 874-0710
Facsimile: (914) 206-3656
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
Kaili C. Lynn (State Bar No. 334933)
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: klynn@bursor.com
              jwilner@bursor.com

*Attorneys for Plaintiff*